Citation Nr: 1714096 
Decision Date: 04/28/17 Archive Date: 05/05/17

DOCKET NO. 10-21 195 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Columbia, South Carolina


THE ISSUES

1. Entitlement to an effective date prior to November 19, 2008, for the grant of a 100 percent disability rating for post-traumatic stress disorder (PTSD).

2. Entitlement to a total disability rating based on individual unemployability due to service-connected disability (TDIU) prior to November 19, 2008.

3. Entitlement to special monthly compensation (SMC) based on the need for aid and attendance or housebound status.


REPRESENTATION

Appellant represented by: Jeany Mark, Attorney at Law


ATTORNEY FOR THE BOARD

N. Nelson, Associate Counsel


INTRODUCTION

The Veteran served on active duty from September 1967 to September 1971, including service in Vietnam. His decorations include a Vietnam Gallantry Cross with Palm, Vietnam Service Medal, and a Vietnam Campaign Medal.

These matters come before the Board of Veterans' Appeals (Board) on appeal from November 2008 and March 2016 rating decisions by the Department of Veterans Affairs (VA) Regional Office (RO) in Columbia, South Carolina. The November 2008 decision implemented an October 2008 Board decision that granted an initial rating of 70 percent for PTSD, and the March 2016 decision denied entitlement to SMC.

The Board notes by way of procedural background that the Veteran initially appealed an October 2005 rating decision that granted service connection for PTSD, assigning a 30 percent disability rating effective May 27, 2005 (the date VA received the claim for service connection for PTSD). During the pendency of that appeal, an initial rating of 50 percent was granted by the RO. The Board denied a rating in excess of 50 percent in a December 2007 decision; however, after a Joint Motion for Remand (JMR) was signed by the United States Court of Appeals for Veterans Claims (Court), a 70 percent initial rating for PTSD was ultimately granted by the Board in October 2008 and implemented by the RO in a November 2008 rating decision. In a November 2008 letter, the Veteran's representative raised the issue of entitlement to a TDIU. She again raised the issue in a March 2009 letter, expressing disagreement with the November 2008 rating decision to the extent that the decision did not grant entitlement to a TDIU; however, the RO advised her that the letter could not be considered a notice of disagreement because no decision on entitlement to a TDIU had been made. As such, the Veteran's representative had in effect initiated a claim for a TDIU on the Veteran's behalf. See Rice v. Shinseki, 22 Vet. App. 447 (2009).

In October 2009, the RO increased the rating for PTSD to 100 percent, effective November 19, 2008 (the date that a claim for TDIU was received), and denied entitlement to a TDIU. The Veteran perfected an appeal concerning the effective date for the 100 percent rating for PTSD and the denial of entitlement to a TDIU. Since then, the issues have been the subject of four Board decisions. In September 2011, the Board denied entitlement to an effective date earlier than November 19, 2008, for a 100 percent rating for PTSD and denied entitlement to a TDIU. The Court vacated and remanded the Board's decision in June 2012. In March 2013, the Board again denied entitlement to an effective date earlier than November 19, 2008, for a 100 percent rating for PTSD and denied entitlement to a TDIU. The Court granted a JMR in April 2014, vacating and remanding the issues. In October 2014, the Board denied for the third time an effective date earlier than November 19, 2008, for a 100 percent rating for PTSD and denied entitlement to a TDIU. The Court granted a JMR in June 2015, vacating and remanding the issues. Most recently, in December 2015, the Board denied an effective date earlier than November 19, 2008, for a 100 percent rating for PTSD and denied entitlement to a TDIU. The Court granted a JMR in October 2016, vacating and remanding the issues. 

The issue of entitlement to special monthly compensation (SMC) based on the need for aid and attendance or housebound status is addressed in the REMAND portion of the decision below and is REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDINGS OF FACT

1. For the entire period on appeal (from May 27, 2005 to November 18, 2008), the evidence is in equipoise on whether the Veteran's service-connected PTSD manifested by total occupational and social impairment.

2. The Veteran's request for entitlement to a TDIU is based solely on his one service-connected disability, PTSD, which is rated at 100 percent.


CONCLUSIONS OF LAW

1. For the entire period on appeal, the criteria for a rating of 100 percent for PTSD have been met. 38 U.S.C.A. §§ 1155, 5107(b) (West 2014); 38 C.F.R. §§ 3.321, 4.3, 4.7, 4.130, Diagnostic Code 9411 (2016). 

2. The claim of entitlement to a TDIU is rendered moot by the grant of an initial 100 percent schedular rating for PTSD, leaving no question of law or fact to decide on the TDIU issue. 38 U.S.C.A. §§ 7104, 7105 (West 2014); 38 C.F.R. §§ 4.14, 4.16 (2016).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Duties to Notify and Assist

VA has a duty to notify and assist claimants in substantiating a claim for VA benefits. When VA receives a complete or substantially complete application for benefits, it is required to notify the claimant and the representative, if any, of any information and medical or lay evidence that is necessary to substantiate the claim. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b). 

As the Board is granting the claim for an initial rating of 100 percent for PTSD, the claim is substantiated and there are no further actions necessary on the part of VA to notify or assist with respect to this claim. Wensch v. Principi, 15 Vet App 362, 367- 68 (2001); see also 38 U.S.C.A. § 5103A(a)(2) (Secretary not required to provide assistance "if no reasonable possibility exists that such assistance would aid in substantiating the claim"). 

Law and Regulations

Disability evaluations are determined by the application of VA's Schedule for Rating Disabilities (Rating Schedule), 38 C.F.R. Part 4. The percentage ratings contained in the Rating Schedule represent, as far as can be practicably determined, the average impairment in earning capacity resulting from diseases and injuries incurred or aggravated during military service and the residual conditions in civil occupations. 38 U.S.C.A. § 1155; 38 C.F.R. §§ 3.321(a), 4.1. 

Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7. 

Where entitlement to compensation has already been established and an increase in the disability rating is at issue, it is the present level of disability that is of primary concern. See Francisco v. Brown, 7 Vet. App. 55, 58 (1994). Nevertheless, where the evidence contains factual findings that show a change in the severity of symptoms during the course of the rating period on appeal, assignment of staged ratings would be permissible. See Fenderson v. West, 12 Vet. App. 119 (1999). 

The rating criteria for rating mental disorders, including PTSD, reads as follows: a 100 percent rating requires total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions of hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation or own name. 38 C.F.R. § 4.130.

A 70 percent rating requires occupational and social impairment, with deficiencies in most areas, such as work, school, family relations judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work-like setting); inability to establish and maintain effective relationships. Id.

The Court has held that Global Assessment of Functioning (GAF) scores are a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." See Carpenter v. Brown, 8 Vet. App. 240, 242 (1995); Richard v. Brown, 9 Vet. App. 266 (1996) (citing the American Psychiatric Association's DIAGNOSTIC AND STATISTICAL MANUAL FOR MENTAL DISORDERS (4th ed.) (DSM-IV), p. 32). 

GAF scores ranging from 61 to 70 reflect some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, and has some meaningful interpersonal relationships. Id. 

Scores ranging from 51 to 60 reflect more moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Id. 

Scores ranging from 41 to 50 reflect serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). Id.

Scores ranging from 31 to 40 reflect some impairment in reality testing or communications (e.g. speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g. depressed man avoids friends, neglects family, and is unable to work). Id.

The Secretary of VA recently amended the portion of the Schedule for Rating Disabilities dealing with psychiatric disorders and the associated adjudication regulations to remove outdated references to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV), and replace them with references to the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5). However, the amended provisions do not to apply to claims that were pending before the Board (i.e., certified for appeal to the Board) on or before August 4, 2014, even if such claims are subsequently remanded to the AOJ. The instant appeal was initially certified to the Board in August 2007. Therefore, the new version of the Schedule for Rating Disabilities is not for application in the instant appeal.

Evaluation under § 4.130 is symptom-driven, meaning that symptomatology should be the fact-finder's primary focus when deciding entitlement to a given disability rating under that regulation. Vazquez-Claudio v. Shinseki, 713 F.3d 112, 116-17 (Fed. Cir. 2013). The Federal Circuit explained that the frequency, severity, and duration of the symptoms also played an important role in determining the rating. Id. at 117. Significantly, however, the list of symptoms under the rating criteria are meant to be examples of symptoms that would warrant the rating, but are not meant to be exhaustive, and the Board need not find all or even some of the symptoms to award a specific rating. Mauerhan v. Principi, 16 Vet. App. 436, 442-43 (2002). If the evidence shows that the Veteran suffers symptoms listed in the rating criteria or symptoms of similar severity, frequency, and duration, that cause occupational or social impairment equivalent to what would be caused by the symptoms listed in the criteria for a particular rating, the appropriate equivalent rating will be assigned. Id. at 443; see also Vazquez-Claudio, 713 F.3d at 117.

Once the evidence has been assembled, it is the Board's responsibility to evaluate the evidence. 38 U.S.C.A. § 7104(a). The Secretary shall consider all information and lay and medical evidence of record in a case before the Secretary with respect to benefits under laws administered by the Secretary. The Board must analyze the credibility and probative value of the evidence, account for the persuasiveness of the evidence, and provide reasons for rejecting any material evidence favorable to the claimant. Caluza v. Brown, 7 Vet. App. 498, 506 (1995), aff'd per curiam, 78 F.3d 604 (Fed.Cir.1996). The Board assesses both medical and lay evidence. In addressing lay evidence and determining its probative value, if any, attention is directed to both competency ("a legal concept determining whether testimony may be heard and considered") and credibility ("a factual determination going to the probative value of the evidence to be made after the evidence has been admitted"). See Layno v. Brown, 6 Vet. App. 465, 469 (1994). 

When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant. 38 U.S.C.A. § 5107; 38 C.F.R. §§ 3.102, 4.3. 

In Gilbert v. Derwinski, 1 Vet. App. 49, 54 (1990), the Court stated that "a veteran need only demonstrate that there is an 'approximate balance of positive and negative evidence' in order to prevail." To deny a claim on its merits, the evidence must preponderate against the claim. See also Alemany v. Brown, 9 Vet. App. 518, 519 (1996).

Earlier Effective Date for a 100 Percent Rating for PTSD

The Veteran contends that he should be entitlement to an effective date earlier than November 19, 2008, for the grant of a 100 percent rating for PTSD. He indicates that his everyday living is diminished to the point that he cannot handle the simplest stresses of daily life. He states that he has not worked since 2004. See the May 2007 statement; March 2009 notice of disagreement.

The Board notes preliminarily that, as discussed in the Introduction, the Veteran's claim for service connection for PTSD was received on May 27, 2005, which is the assigned effective date for the 70 percent initial rating currently in effective. The Veteran never appealed the effective date for the grant of service connection for PTSD.

After careful review, the Board finds that for the entire period of appeal (from May 27, 2005 to November 18, 2008), the evidence is in equipoise on whether the Veteran's PTSD symptoms manifested by total occupational and social impairment.

VA treatment records indicate that in May 2005, the Veteran was referred by his doctor to a VA mental health clinic for recurring nightmares and suicidal thoughts. He was put on Celexa one week prior by his primary care doctor. The Veteran reported to VA psychiatrist, Dr. J.L., that he was having problems with sleep, depression, and thoughts of suicide for the past three years. He indicated that he was sad much of the time every day, and had problems falling asleep and waking up; however, since starting Celexa, his sleep was more restful. He also stated that he had lost 30 pounds in the past two years, and a medical cause could not be found. He lost motivation for doing things, and his suicidal thoughts included passing plans of stepping in front of trucks for 30 seconds to one minute before he pushed it out of his mind. The Veteran reported that he heard voices, like someone talking on the television in another room, when he woke up at night. He did not hear voices during the day, had no visions, and no delusions. Other symptoms included hypervigilance, hair trigger temper, flashbacks, social isolation, and startling easily. Dr. J.L. indicated that the Veteran was alert, oriented, and had speech and motor behavior within normal limits. Dr. J.L. diagnosed PTSD and major depression, recurrent with fleeting suicidal ideation and no intent. He increased the Veteran's citalopram (Celexa) to 40 milligrams (mg) once per day (qd), and referred the Veteran to a VA social worker. In June 2005, the Veteran began attending VA PTSD support groups. Also in June 2005, Dr. J.L. indicated that the Veteran was less sad, a mild improvement, and was sleeping through the night more. The Veteran was also able to push his suicidal thoughts out of his head faster. His citalopram was increased to 60 mg qd. In August 2005, Dr. J.L. noted that the Veteran's citalopram had been reduced to 40 mg qd because his stomach could not tolerate the higher dosage. 

In an October 2005 VA PTSD examination, the Veteran presented with his wife of 36 years. Reportedly, he and his wife had divorced in 1986 but remarried in 1987, and remained married ever since. The examiner noted the Veteran was appropriately attired and presented a commanding presence with a strong Marine appearance. The Veteran was extremely cordial and straightforward with the examiner. He reported that he was a high school graduate, and following separation from active service, he reportedly worked several jobs, most of which he quit or was "let go from," reportedly due to interpersonal conflicts on the job. According to the Veteran, he had worked for Creel Oil Company for two years, then as a truck driver for Ronald B. Rayburn Corporation for five years, and lastly, for Creel Oil Company for 10 years. He reported he had ceased working for Creel due to "disability" resulting from two back surgeries and one neck surgery. When further questioned, the Veteran reported taking medication for his mood. The Veteran listed suicidal ideation as a symptom, indicating that he used to have plans of staging an automobile accident or stepping in front of a truck, but that he felt better and did not have those plans anymore because he had been able to talk to his wife and VA medical professionals about some things. The Veteran's wife opined that the Veteran was depressed, and, at times, appeared to be in a daze where he would not speak, or would talk very harshly. The Veteran's wife further indicated that he never seemed to get a full night's sleep. It was also noted that he no longer abused alcohol. When questioned regarding his physical disabilities, the Veteran complained of a torn right rotator cuff, for which he had reportedly undergone magnetic resonance imaging. 

On mental status examination, the Veteran was oriented to time, place, and person. He maintained positive eye contact, and, when questioned, denied any hallucinations or delusions. His speech was of normal rate and volume, and both cognition and speech were described as linear. His mood was depressed, though his sensorium was intact, and although he complained of short-term memory loss, no memory impairment was detected at the time of examination. His wife reported that the Veteran's impulse control had improved significantly, though there were still instances of road rage. According to the Veteran, he spent his days "piddling around the house," meaning he washed his vehicles, and had a small shop where he worked on small projects. The diagnosis was PTSD, chronic and presently moderate, with a GAF score of 58. According to the examiner, while the Veteran had apparently struggled with authoritarian/supervisory issues culminating in "firings" in the past, this had "markedly" abated since his initial discharge from the Marine Corps. Also abated were, it appeared, the Veteran's problems with suicidal thoughts. The examiner opined that the Veteran was "unemployed due to operations on his back and problems with his shoulder." 

The Veteran attended another PTSD support group meeting in December 2005. In an individual appointment with a nurse practitioner, the Veteran denied having homicidal or suicidal thoughts. His GAF score was 56. 

VA outpatient records reveal that in 2006, the Veteran participated in a PTSD support group approximately once or twice per month, and had individual appointments with a nurse practitioner every three months. His GAF score was noted as 56 in March, June, September, and December 2006. 

In March 2006, The Veteran denied suicidal ideation and endorsed irritability, reclusiveness, anxiety, hypervigilance, and flashbacks. He stated that he was going to the gym daily, had quit smoking, and found the PTSD group helpful. 

A May 2006 letter from the Veteran's VA nurse practitioner notes that the Veteran continued to experience symptoms of disturbed sleep with nightmares, flashbacks, reclusiveness, hyperarousal, and avoidance of situations that reminded him of his stressors. She indicated that the Veteran continued to report chronic interference in social, family, and recreational functioning due to post-traumatic stress symptomatology. He continued to rely on stress avoidance as a primary comping strategy, and his prognosis was limited due to severity and chronicity of his mental illness. 

In September 2006, the Veteran indicated that he wished to kill his brother-in-law. However, he later indicated that he had no plan to kill his brother-in-law, though he was really angry at him over an altercation involving a drainage ditch. According to the Veteran, he continued to experience problems with angry outbursts and irritability, and stayed in most days. He was reportedly irritated with his wife due to finances. 

In December 2006, the Veteran reported that he had made peace with his brother-in-law, was active in his church, had started going to a gym in Aynor, got a new golden retriever, and watched college football at his daughter's house. He was also planning to take a computer course. 

The Veteran was afforded another VA PTSD examination in February 2007. The examining psychologist preliminarily noted that the Veteran's claims folder had been reviewed, and included extensive documentation of his treatment for PTSD in both group and individual sessions. The Veteran reported that he had been married for over 30 years (although he had been divorced from his wife for a year, they had remarried), had two grown children, and six grandchildren. He indicated that he spent time with the children and grandchildren, though it was admittedly difficult and stressful for him to be around them. When they visited, he frequently spent only a brief time with them prior to retiring to his bedroom because they were "too much" for him. According to the Veteran, he did not sleep well if he did not take his medication and noted was that he had a poor appetite. The Veteran indicated that exercised several days a week, though he endeavored to go to the gym early in the morning when no one else was present. He enjoyed playing solitaire on the computer and surfing the internet, but engaged in few recreational activities. He had been enrolled in a computer class and enjoyed it until another student was seated next to him at the same desk. He further indicated he no longer attended church with his wife, and there were times when he spent the whole weekend in bed because he did not have the desire to go out or do anything. He still drove himself, however, not for distances of more than 10 to 20 miles. While he reported intermittent suicidal ideation, the Veteran indicated he always discussed that ideation with his physician. The Veteran indicated that, in his opinion, his symptoms were worse than at the time of his 2005 examination, particularly in that he had been isolating more. 

On mental status examination, he was described as mildly disheveled and unkempt, in contrast to his appearance in the October 2005 VA examination, and according to the Veteran's wife, she found it necessary to admonish the Veteran to dress better for his medical appointments. It was noted that the Veteran was cooperative throughout the interview, although his affect was negative. According to the examiner, the Veteran appeared bitter, discouraged, and resentful, although he did not become confrontational or escalate his irritability during the interview. The examiner indicated that the Veteran did not appear to be functioning at anywhere near his full mental capacity, and that his efficiency appeared impaired corresponding to his physical impairments. However, the Veteran did know the correct date and day of the week. His memory was intact, and both verbal comprehension and abstracting ability appeared within normal limits. At the time of evaluation, the Veteran displayed difficulties with concentration, reasoning, and recall. In that regard, the examiner was of the opinion that the Veteran's cognitive functioning was affected by anxiety, rumination, and a depressed affect. When questioned, the Veteran noted that he intended to try the computer class again if it could be arranged for him to sit by himself. Further, at the time of examination, the Veteran stated that his wife managed all of the household finances, and that he turned all of his income over to her and never managed any money. Reportedly, he had experienced "financial problems" prior to his quitting alcohol, though he and his wife had no significant financial problems at the present time. The Veteran stated that his wife made all of the deposits and bill payments, and it was noted that, given that the Veteran did not manage any of his money, he did not appear capable of managing benefits awarded in his own interest. The examiner assigned a GAF score of 52, indicative of "moderate" symptomatology. The diagnosis was chronic moderate PTSD. 

VA treatment records indicate that in 2007, the Veteran continued to be seen between March and December 2007 for individual treatment and PTSD support group meetings. The Veteran attended two support group meetings in March, one in April, one in May, three in September, two in October, three in November, and one in December. He was seen individually in April, September, and November. 

In an April 2007 individual appointment, the Veteran was coping with family conflict in a more effective way by limiting contact with his brother-in-law. While he reported he had once again quit his computer class because he became irritated with another student, he reported being less irritable since he started avoiding the news. He additionally reported he was still going to the gym daily, was again active at church, and enjoyed socializing with his family and grandchildren. His PTSD group sessions continued to be an important social support. His GAF score was 56. However, a few days later, in a telephone call, the Veteran reported that he was very depressed and had experienced some suicidal thoughts. According to him, his mood change was triggered by news that his cousin had been ordered to Afghanistan. The Veteran "contracted for safety" with his nurse. The next day, he indicated that he was lying in bed and thought that he would "be better off dead." However, he denied both suicidal ideation and plan, stating that he would not commit suicide due to his religious beliefs. According to the Veteran, he felt better after taking a shower, and was looking forward to his granddaughter's sixth birthday that night. 

In September 2007, VA received a telephone call from the Veteran's daughter indicating that the Veteran had threatened to kill his family. Upon speaking to the Veteran shortly thereafter, he indicated that his weapons were locked up, and that his wife had the key. He asserted that he no longer felt like hurting himself or anyone else, verbally contracted for safety, and was noted to have difficulty controlling his anger. When he was seen approximately one week later, he indicated that he had been feeling more depressed since April. He stated that he sometimes sat alone and cried and he did not know why. On examination, the Veteran was found to be appropriately dressed and his speech was of a normal rate, tone, and volume. His affect was congruent with mood, and his thought processes were both logical and goal directed. Thought content was without auditory or visual hallucinations or delusions; cognition was intact, alert, and oriented; judgment and insight were fair; and both memory and concentration were good. While the Veteran noted that he had thought about killing himself as he drove to the appointment, he also stated that he did not feel suicidal, and in the opinion of the nurse practitioner, this constituted only vague suicidal ideation without a plan. The Veteran was also noted to be active in his church and to enjoy his golden retriever. He socialized with family and enjoyed his grandchildren. His GAF score was assessed as 47.

The Veteran testified in an October 2007 Board hearing that he had children and grandchildren who lived near him, and when they came to visit he would speak with them for a bit, and then leave the room to go to bed or get on the computer. The Veteran asserted that his wife told him all the time that he would feel better if he would wash and shave, but that he preferred to stay home by himself most of the time. He stated that since separation from service, he had 20-25 truck-driving jobs, the longest of which he held for 10 years, and which allowed him to be by himself most of the time. The Veteran indicated that his wife and other family members helped him keep track of appointments and events, and that he experienced difficulty with names, including those of family, friends, and people he knew well, sometimes calling them "different things." He also indicated that his wife helped him get dressed. Other symptoms included panic attacks that occurred approximately once a week, taking medication to sleep, and inability to stay on task and concentrate. The Veteran's wife testified that the Veteran would go anywhere he wanted to go without thinking about his appearance, and that he could be a slob at home and in public. 

In November 2007, during the course of VA outpatient treatment, the Veteran indicated he continued to have violent fantasies, but had been given reinforcement for being able to control his hostility. The Veteran reported that he continued to work out at the gym, though, in his opinion, his PTSD symptomatology had increased due to his first cousin going to Afghanistan. Noted at the time was that the Veteran had driven to the appointment without incident, and that he denied anhedonia/anergia, as well as feelings of hopelessness or helplessness. While he continued to avoid the news, the Veteran continued to be active in his church and enjoyed his golden retriever, Buddy. According to the Veteran, he socialized with family and enjoyed his grandchildren. Moreover, his PTSD group continued to be an important source of support. According to the treating physician, the Veteran wanted him to know that he had a plan for suicide, which he did not want to tell anyone. The Veteran's GAF score was 50. 

Throughout 2008, the Veteran attended two support group meetings in January, and one each in April, September, and November. He was seen individually in February, July, November, and December 2008.

In mid-February 2008, the Veteran indicated that he had "something like a panic attack" a few days prior, and that he was worried about his memory, though he had driven to the day's appointment without incident. Once again, he denied both anhedonia and anergia, as well as feelings of hopelessness and helplessness. His medication was reportedly effective for sleep and nightmares. While he continued to avoid the news, he remained active in his church, enjoyed his golden retriever, socialized with his family, and enjoyed his grandchildren. Moreover, his PTSD group continued to be an important source of support. On mental status examination, the Veteran was once again described as appropriately dressed and cooperative, without evidence of psychomotor agitation or retardation. His speech was of a normal rate, tone, and volume, and his mood was euthymic. His affect was congruent with his mood, and his thought processes were logical and goal directed, and focused on his service connection claim. His thought content was devoid of auditory or visual hallucinations or delusions, and there was no evidence of either suicidal or homicidal ideation or plan. Cognition was described as intact, and he was alert and oriented. Once again, judgment and insight were characterized by only fair to poor impulse control; however, memory, concentration, sleep, and appetite were described as good. It was noted that his last GAF score obtained in early November 2007 was 50, while the current GAF score was 55. 

A July 2008 mental health progress note reflected that the Veteran reported that he had been consistent with his psychotropic medications, which had been somewhat effective. Further noted was that the Veteran was not concerned about his memory, and that he had driven to the appointment without incident. While the Veteran reported arguing with his wife, his daughters were supportive in their discussion of strategies with him. At the time of treatment, the Veteran denied anhedonia and anergia, and similarly denied any feelings of helplessness and/or hopelessness. Also noted was that the Veteran had become able to control his temper somewhat better. He continued to be uncomfortable in large groups, and requested individual counseling or a small group. As far as his social interactions were concerned, the Veteran reported that he had not been attending church, though he continued to enjoy his golden retriever, socialized with his family, and enjoyed his grandchildren. He described a recent stressor of his wife's displeasure with the fact that he had cosigned a female friend's car loan; however, he described his relationship with that friend as platonic. While the Veteran understood why his wife was upset, he noted that she was "verbally abusive". The Veteran reported that he was unable to exercise due to his orthopedic problems. His depression was judged to be stable on his then current medication. His GAF score remained at 55. 

In a November 2008 outpatient entry, it was noted that the Veteran's relationship with his female friend continued to be a significant marital stressor. Reportedly, the Veteran's wife had told him to leave his home when she learned the Veteran had been having breakfast with his female friend, and that he had spent the night at his friend's residence. The Veteran endorsed suicidality over the incident, in addition to feelings of anhedonia and helplessness. While he continued to avoid the news, the Veteran indicated he wanted to start exercising again when cleared by orthopedics. On mental status examination, he was unshaven but appropriately dressed and cooperative, without evidence of psychomotor agitation or retardation. His speech was of normal rate and volume, and his mood euthymic, except when he was discussing his wife's behavior. At the time of examination, his affect was dysthymic, but his thought processes were logical and goal directed. Thought content was without auditory or visual hallucinations, and there was no evidence of suicidal or homicidal ideation or plan. Cognition was described as intact and the Veteran was well oriented. The nurse practitioner assessed impulse control as poor, and judgment and insight were described as fair. The nurse practitioner indicated that the Veteran was depressed due to his marital conflicts, but that his PTSD symptomatology was stable. A GAF score of 55 was assigned.

In December 2008, the Veteran had a VA mental health diagnostic assessment after reporting suicidal ideation with a plan. He stated that he had a friend commit suicide by carbon monoxide poisoning, and that is the way he would choose to commit suicide as well. He also indicated that he could jump out of the hospital window, but that the roof was too close, he was not mobile enough to get out of bed, and that he did not want to commit suicide at that moment. He endorsed depressive symptoms including not doing some activities that he enjoyed, difficulty sleeping, and "some small memory difficulties." He also reported losing track of time, difficulty concentrating, irritability, and a lack of libido. A recent stressor was his relationship with his wife. The relationship had been strained and they did not communicate or do things together because the Veteran had a female friend that caused stress. The Veteran reported that he occasionally heard voices like a radio playing in the background and was irritable and "jumpy." The treating doctor indicated that these symptoms were due to the PTSD. His GAF score was assessed as 55. The next day, in a follow-up appointment, the Veteran was bright and without suicidal thoughts or plans. He also had a brighter outlook and was very engaging. His GAF score remained at 55.

Finally, in June 2011, a letter report from a clinical psychologist, Dr. C.R., was submitted. Dr. C.R. reported reviewed the pertinent records from the Veteran's claims file, and noted that the 2009 decision to increase the rating from 70 percent to 100 percent was based largely on a July 2009 VA examination report, including a GAF score of 50, significant irritability, isolation and inactivity, insomnia, impaired concentration, and "aggressive" thoughts. Dr. C.R. opined that the February 2007 VA examination report painted "a remarkably similar picture," including perhaps most importantly, a GAF score of 52 and a finding that the Veteran was not competent to manage his benefits at that time. Dr. C.R. opined that the Veteran demonstrated essentially the same degree of disability at the time of his February 2007 VA examination as he did in the July 2009 VA examination and set forth essentially the same events and findings as those set forth on previous occasions. Dr. C.R. placed special emphasis on the Veteran's GAF scores from 2005 up to the present, and noted that his GAF score in 2005 was 58, whereas in 2006, it was consistently estimated at 56. Beginning in February 2007, however, the GAF score assigned was 52. As such, the Veteran's PTSD symptoms warranted a 100 percent rating since February 2007. Furthermore, Dr. C.R. opined that the PTSD symptoms were of sufficient severity to render the Veteran unable to hold substantial employment due to his inability to control his anger and irritability unless completely isolated. She found that although the Veteran cited back pain in the July 2009 VA examination as the primary cause for his retirement, the primary cause was actually due to difficulties getting along with other workers or supervisors, which was due to PTSD symptoms. Dr. C.R. concluded that the Veteran was only able to work when guaranteed to have minimal contact with any other person, which was a condition not easily found in the workplace and one that left him essentially unemployable.

In light of the rating criteria above, the Board concludes that the evidence is in equipoise on whether the Veteran's symptoms more nearly approximated those listed in the 100 percent evaluation for the entire period of appeal. VA treatment records and examinations reflect that the Veteran has had fluctuating symptoms and GAF scores throughout the appeal period, but that he has consistently been found to have suicidal thoughts, and at least twice had homicidal thoughts. Specifically, the Veteran reported having suicidal thoughts in May and October 2005; February, April, and September, 2007; and November 2008. He also reported having homicidal ideation toward his brother-in-law in September 2006, threatened to kill his family in September 2007, and reported having "violent fantasies" in November 2007. 

The Board also finds the June 2011 letter from Dr. C.R. to be probative. See Gabrielson v. Brown, 7 Vet. App. 36, 39-40 (1994). Her opinions were rendered after reviewing VA medical records, VA examinations, military service records, and the Board hearing transcript. She also provided specific dates, documents, and information used in rendering her opinions, and provided rationales for her opinions. See Prejean v. West, 13 Vet. App. 444 (2000) (factors for assessing the probative value of a medical opinion include the examiner's access to the claims folder and the Veteran's history, and the thoroughness and detail of the opinion). The Board finds Dr. C.R.'s opinion persuasive with regard to the Veteran's symptoms being consistent between the February 2007 and July 2009 VA examinations, and the July 2009 VA examination being used as a significant basis for the grant of a 100 percent rating effective November 19, 2008. Dr. C.R.'s opinion is also persuasive regarding her opinion that his retirement stemmed at least in significant part from his inability to get along with coworkers or supervisors due to his PTSD symptoms. 

The Board notes that there is probative evidence against a rating in excess of 70 percent for the Veteran's PTSD, including a range of GAF scores predominantly between 52 and 56, reflecting only moderate symptoms. The Veteran's GAF score was 47 in September 2007 and it was 50 in November 2007, reflecting serious symptoms, but the Board does not find two scores in a two-month period to be reflective of the Veteran's overall disability picture for the approximately three-year period of appeal, and notes that since February 2008, the Veteran's GAF score was consistently noted to be 55. The Board also notes the February 2007 VA examiner's opinion that the Veteran's PTSD symptoms were "moderate." 

Nevertheless, under the law, where there exists "an approximate balance of positive and negative evidence regarding the merits of an issue material to the determination of the matter," the Veteran shall prevail upon the issue. Ashley v. Brown, 6 Vet. App. 52, 59 (1993); see also Massey v. Brown, 7 Vet. App. 204, 206-207 (1994). The Board finds that this is a situation where the benefit of the doubt rule applies, as there is "an approximate balance of positive and negative evidence regarding the merits of an issue material to the determination of the matter." Ashley, 6 Vet. App. at 59; 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102. In resolving all reasonable doubt in the Veteran's favor, a 100 percent rating for PTSD is warranted for the entire period of appeal.

This decision should represent, as best as can be determined, a full grant of what the Veteran is currently seeking before the Board. To this end, the Board notes that the Veteran's counsel ably and specifically articulated why the increased rating or alternatively a TDIU, is warranted, back to May 27, 2005. See January 2017 brief; April 2010 correspondence; November 2009 NOD.

Thus, given the record before it, the Board trusts that both the Veteran and his counsel are satisfied with this decision. See Massie v. Shinseki, 25 Vet. App. 123, 131 (2011) ("[T]he Board ... was entitled to assume that the arguments presented by [the appellant] were limited for whatever reason under the advice of counsel and that those were the theories upon which he intended to rely."), aff'd, 724 F.3d 1325 (Fed. Cir. 2013); Mason v. Shinseki, 25 Vet. App. 83, 95 (2011) (holding that "the Court will not invent an argument for a represented party who had ample opportunity and resources to make that same argument, but, for whatever reason-be it strategy, oversight, or something in between-did not do so"); Robinson v. Peake, 21 Vet. App. 545, 554 (2008) ("The presence of [an] attorney throughout the appeals process before the Agency is a significant factor . . . [w]e presume that [the] attorney, an experienced attorney in veteran's law, says what he means and means what he says"), aff'd sub nom. Robinson v. Shinseki, 557 F.3d 1355 (Fed. Cir. 2009).

Extraschedular Consideration

The Board has considered whether referral for an "extraschedular" evaluation is warranted. In exceptional cases, an extraschedular rating may be provided. 38 C.F.R. § 3.321. The threshold factor for extraschedular consideration is a finding that the evidence before VA presents such an exceptional disability picture that the available schedular evaluations for the service-connected disability are inadequate. Therefore, initially, there must be a comparison between the level of severity and symptomatology of the Veteran's service-connected disabilities with the established criteria found in the rating schedule for that disability. Thun v. Peake, 22 Vet. App. 111 (2008). If the criteria reasonably describe the Veteran's disability level and symptomatology, then the Veteran's disability picture is contemplated by the rating schedule and no referral is required. 

In the second step of the inquiry, however, if the schedular evaluation does not contemplate a Veteran's level of disability and symptomatology and is found inadequate, it must determine whether the Veteran's exceptional disability picture exhibits other related factors such as those provided by the regulation as "governing norms." 38 C.F.R. § 3.321(b)(1) (related factors include "marked interference with employment" and "frequent periods of hospitalization"). 

When the rating schedule is inadequate to evaluate a Veteran's disability picture and that picture has related factors such as marked interference with employment or frequent periods of hospitalization, then the case must be referred to the Under Secretary for Benefits or the Director of the Compensation and Pension Service for completion of the third step, a determination of whether, to accord justice, the Veteran's disability picture requires the assignment of an extraschedular rating.

In this case, the evidence fails to show unique or unusual symptomatology regarding the PTSD that would render the schedular criteria inadequate. The Veteran's symptoms, including suicidal and homicidal ideations, impaired sleep, memory and concentration problems, irritability and anger, social isolation, impaired judgment, hypervigilance, and flashbacks are contemplated in the ratings assigned; thus, the application of the Rating Schedule is not rendered impractical. Moreover, the Veteran has not argued that his symptoms are not contemplated by the rating criteria; rather, he merely disagreed with the assigned disability rating for his level of impairment. In other words, he did not have any symptoms from his service-connected PTSD that are unusual or different from those contemplated by the schedular criteria. Moreover, the Veteran has not alleged or indicated that the collective impact or combined effect of more than one service-connected disability presents an exceptional or unusual disability picture to render inadequate the schedular rating criteria. See Johnson v. McDonald, 762 F.3d 1362 (Fed. Cir. 2014). Accordingly, the Board finds that referral for consideration of extraschedular ratings is not warranted, as the manifestations of the Veteran's disability are considered by the schedular rating assigned. 38 C.F.R. § 3.321; Thun, 22 Vet. App. 111.

TDIU

With respect to the Veteran's request for a TDIU, the Board notes that the Veteran now has a 100 percent evaluation for her PTSD for the entire appeal period. A TDIU rating contemplates that the schedular rating is less than total. 38 C.F.R. § 4.16(a). Because the Board has determined that the Veteran's PTSD warrants a 100 percent evaluation, effective May 27, 2005, and because the Veteran's request for a TDIU was filed during the claim period (in November 2008), the request for a TDIU is rendered moot.

The Board recognizes that it is not categorically true that assignment of a total schedular rating always renders a TDIU request moot, particularly as it relates to possible entitlement to special monthly compensation. See Bradley v. Peake, 22 Vet. App. 280 (2008). In Bradley, the Court held that a TDIU rating could be warranted in addition to a schedular 100 percent evaluation, where the TDIU could be granted for a disability other than the disability for which a 100 percent rating was in effect, explaining that under such circumstances, there was no "duplicate counting of disabilities." Bradley, 22 Vet. App. at 293. Unlike the situation in Bradley, the Veteran in this case is receiving compensation for just one disability, PTSD, for which a 100 percent schedular rating has been assigned. Bradley is therefore distinguishable from the instant case, and the award of a 100 percent schedular evaluation does indeed render the TDIU request moot.






ORDER

For the entire period on appeal, a rating of 100 percent for PTSD is granted.

The appeal for entitlement to a TDIU is dismissed.


REMAND

A March 2016 rating decision by the RO in Columbia, South Carolina, denied entitlement to special monthly compensation (SMC) based on the need for aid and attendance or housebound status. The Veteran submitted a notice of disagreement in March 2017, indicating that he disagreed with the denial, and a Statement of the Case (SOC) has not been issued. As such, the Board is required to remand the issues for issuance of an SOC. Manlincon v. West, 12 Vet. App. 238 (1999).

Accordingly, the case is REMANDED for the following action:

Issue an SOC to the Veteran and his representative addressing the issue of entitlement to SMC based on the need for aid and attendance or housebound status. The Veteran and his representative should be advised of the time limit in which to file a Substantive Appeal. Then, if the appeal is timely perfected, the issue should be returned to the Board for further appellate consideration, if otherwise in order.

The appellant has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).




______________________________________________
H. SEESEL
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs